AFFIRMED and Opinion Filed December 6, 2018



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-17-00506-CR

**TEMMIE COOLEY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-82809-2014**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Lang-Miers
Opinion by Justice Francis

This is a cold case prosecution in which the jury convicted Temmie Cooley of the decades-old murder of a co-worker with whom he was having an affair. The trial court assessed punishment at eighty years in prison. In a single issue, appellant contends the trial court abused its discretion by allowing evidence of a 2001 murder conviction as proof of identity in this case. For the reasons set out below, we affirm.

On the night of November 24, 1989, Sharon Trimble told her husband she was going to visit a friend, left her children in the care of a babysitter, and left the house in her car at about 10:15 p.m. When Trimble had not returned home by 4 a.m., her husband began to worry. He called family members and friends and ultimately filed a missing person report with the police.

Several hours later, at about 11:30 a.m., Trimble's body was found in a ditch on the side of a dirt road in an undeveloped area of Plano. Trimble was nude from the waist down, her brassiere was pushed up, and her sweater was draped around her, with one arm in the sweater and one arm out. Her boots were near her head, and she was still wearing jewelry. Neither her purse nor car were at the scene. Investigators believed the crime involved a sexual component.

Collin County Medical Examiner William Rohr performed an autopsy the same day. He determined that Trimble died by ligature strangulation, which he said is a "distinctly uncommon" cause of death. In addition to the neck injury, Rohr said there were recent bruises on the upper chest, some bruising and faint abrasion of the jaw area, and bruising underneath the lip and on the tongue, suggesting "some type" of blow from being punched or having fallen and hit her face. There were no defensive wounds on her body, leading police to believe she was taken by surprise or knew the person and was not afraid to let him get close enough to get behind her and put something around her neck. Among other things, Rohr collected a sexual assault kit, which included oral, vaginal, and anal swabs. The technology did not exist in 1989 to develop a DNA profile, but a serologist testified that sperm was detected on vaginal and anal smears, confirming suspicions of a sexual element to the crime.

Two days after the body was found, investigators went to the hospital where Trimble worked and talked with her co-workers, one of whom was appellant. Trimble's coworkers said she primarily hung out with appellant, let him drive her car, and described him as her "best friend." One co-worker told investigators that Trimble and appellant were having a sexual relationship, but, in multiple interviews, appellant denied it. He also provided an alibi for his whereabouts on the night of Trimble's death; he said he was helping his pregnant girlfriend move.

Police did not discover where Trimble had been on the night of her death. Her car was found abandoned in an apartment complex about two weeks later within four miles of where

appellant's residence at the time; it had been "wiped clean." The apartment complex manager who reported the abandoned vehicle told police she had seen two men driving the car before they left it in the parking lot. Although police were suspicious of appellant because of the conflicting information they received, no arrest was made.

Fourteen years later, in 2003, cold case investigator Billy Meeks of the Plano Police Department began looking at the Trimble case again. Meeks re-interviewed witnesses and looked at the case file. By that time, DNA technology was more advanced, and he sent samples collected at the time of Trimble's death to a DNA laboratory, where a forensic analyst developed a DNA profile from the vaginal and anal swabs. That profile was entered into the Texas CODIS[1] computer database and received a "hit" showing a match to appellant who was facing a pending murder case in Kaufman County.

In February 2004, Meeks interviewed appellant while he was incarcerated in the Kaufman County Jail as a suspect in the murder of Earlene Warrell. Warrell was found on the side of a county road in a rural area in December 2001; she, too, died by ligature strangulation. During this interview, appellant again denied ever having sexual intercourse with Trimble but said she had performed oral sex on him. He also changed his alibi: in 1989, he said he was helping his pregnant girlfriend move on the night Trimble died; in 2004, he said his girlfriend (who he later married) was not pregnant but that he was either with his girlfriend or another co-worker, Earl Perkins. Meeks interviewed appellant a second time four months later and told him about the DNA results. After learning of the results, appellant admitted to having an ongoing sexual relationship with Trimble, including sex on the day she died. Meeks's investigation did not result in a prosecution.

In early 2014, Detective Beth Spillman took over the case. Spillman located all the files, reviewed the documents and lab reports, and re-interviewed witnesses. Spillman believed that

---

[1] CODIS is the acronym for Combined DNA Index System.

because Trimble was nude when her body was found dumped on a county road, there was a sexual component to the crime. She saw that a DNA profile had been developed and a match obtained from CODIS. Spillman took a DNA sample from appellant to confirm the previous DNA match and interviewed him twice. Appellant denied that he ever denied having a sexual relationship with Trimble in 1989. He also said the last time he had sex with Trimble was either the weekend or the Monday prior to her death on Friday night, not on the day she died, as he had told Meeks. Appellant's DNA sample was sent to a lab for testing. The lab concluded appellant could not be excluded as a contributor to the DNA profile in Trimble's vaginal swabs, and the DNA profile in her anal swabs originated from appellant.

Appellant was indicted in December 2014 for Trimble's murder. In November 2016, a pretrial hearing was held to determine whether appellant's conviction for the murder of Earlene Warrell was admissible. At this hearing, former Texas Ranger Richard Shiang and Spillman testified about the similarities between the murders of Trimble and Warrell.

Shiang assisted in the investigation of Warrell's murder. Her body was found off a rural road in Kaufman County on December 20, 2001. She was nude, partially wrapped in bed linens, and was still wearing her jewelry. An autopsy showed she died of ligature strangulation. Appellant's DNA was found underneath her fingernails.

Shiang learned appellant and Warrell previously worked together and that she told a friend they were involved in a "romantic relationship." But when they questioned appellant, who was married, he initially claimed they were just friends. Later, he confessed to strangling her with the strap of her purse. Appellant said he was with Warrell in her car parked across the street from his apartment discussing their relationship. At one point, he tried to leave but she followed him and he thought she was going to wake his wife. Appellant became agitated, and he choked her with the strap of her purse. He wrapped her body in a sheet and dumped it on the side of a road. He

–4–

said he left her car at a nearby service station hoping someone would steal it. The car was found in a parking lot within four miles of where appellant lived; it was "damaged, wrecked, and on fire."

The State argued the evidence was admissible to provide identity in Trimble's murder because the circumstances of the two crimes were so substantially similar as to show appellant's "signature" or "handiwork." The trial court, however, excluded the evidence. The trial ended in a mistrial when the jury could not reach a unanimous verdict.

Appellant's second trial was set for April 2017 before a newly elected judge. Prior to this trial, the judge reviewed the testimony and evidence presented at the November 2016 pretrial hearing and, over appellant's objection, ruled that evidence of Warrell's murder was admissible for the limited purpose of proving identity. Before the evidence was admitted, the trial court gave the jury a limiting instruction. This trial ended in appellant's conviction.

In his sole issue, appellant contends the trial court abused its discretion by admitting evidence of Warrell's murder because the evidence was not admissible to show identity and its probative value was substantially outweighed by unfair prejudice in violation of Texas Rules of Evidence 403 and 404(b).

We review a trial court's decision to admit evidence concerning an extraneous offense for an abuse of discretion. *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004). As long as the trial court's ruling is within the "zone of reasonable disagreement," the court does not abuse its discretion, and we will uphold the ruling. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

Evidence of extraneous offenses is not admissible to prove that a defendant acted in conformity with a bad character. *See* TEX. R. EVID. 404(b). An extraneous offense, however, may be admissible to show identity when identity is at issue in the case. *Page*, 137 S.W.3d at 336. Identity may be placed in dispute by a defendant's opening statement or cross-examination, as well

as by affirmative evidence offered by the defense. *Segundo v. State*, 270 S.W.3d 79, 86 (Tex. Crim. App. 2008).

Raising identity does not automatically render evidence of extraneous offenses admissible. *See Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006); *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). When the extraneous offense is introduced to prove identity by comparing common characteristics, it must be so similar to the charged offense that the offenses illustrate the defendant's "distinctive and idiosyncratic manner of committing criminal acts." *Page*, 213 S.W.3d at 336. In other words, the theory of relevancy is usually that of *modus operandi* in which the pattern and characteristics of the charged crime and the uncharged misconduct are so distinctively similar that they constitute a "signature." *Segundo*, 270 S.W.3d at 88. "Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual." *Id*. There are no rigid rules dictating what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person. *Id*. If the similarities are generic, or typical to this type of crime, they will not constitute a "signature" crime. *Id*.

Here, we conclude the mode of committing the offenses and the circumstances surrounding the offenses are sufficiently similar for Warrell's murder to be relevant to the issue of identity in Trimble's case. Both were adult females; both were involved in a romantic/sexual relationship with appellant at the time of their deaths; in each case, one of the parties was involved in an extramarital affair (Trimble was married when she was murdered, and appellant was married when Warrell was murdered); the bodies of both women were dumped on the side of a rural road, next to the roadway; both women were nude or partially nude and were partially covered up; both were still wearing jewelry and their purses were never found; both women died from ligature

strangulation, a cause of death that is "distinctly uncommon"; appellant worked with both women; appellant initially denied any relationship with the women, other than friendship; there were no witnesses to the murders; although both women were last seen driving, their cars were not found at the crime scene and were later found within four miles of appellant's apartment; and appellant's DNA was found on the bodies of both women—underneath Warrell's fingernails and from Trimble's vaginal and anal swabs.

Appellant nevertheless argues the offenses were not similar enough to rise to the level of showing a "signature." Specifically, he argues (1) no one saw appellant and Trimble together on the evening she was murdered whereas Warrell told a friend she was going to see appellant on the day she was murdered; Warrell's body was found wrapped in a bed sheet belonging to one of appellant's children; calls were placed from Warrell's cellphone after she was murdered; and appellant's fingerprints were found in Warrell's car after it was recovered. Although there were some details that differed between the two offenses, those differences do not negate the many numerous small details that were similar. For example, evidence showed cellphones were not widely used in 1989 and Trimble did not own one. And the other dissimilarities noted by appellant are not differences in the mode of the commission of the crime but are additional links to appellant. *See Lane*, 933 S.W.2d at 519 (reviewing mode of committing offenses and circumstances surrounding offenses when determining admissibility of extraneous offense).

Appellant also argues the prior offense was too remote to be admissible under rule 404(b). But cases may be sufficiently similar even if committed years apart. For example, in *Lane*, the offenses occurred a decade apart in different states; nevertheless, the court concluded the mode of committing the offenses and the circumstances were sufficiently similar to the extraneous offense to be relevant to identity. *See Lane*, 933 S.W.2d at 519. Similarly, in *Segundo*, an eleven-year difference between the offenses did not render the extraneous offense too remote. *See Segundo*,

270 S.W.3d at 89–90. Given the similarities of the two crimes as set out above, we conclude it was within the zone of reasonable disagreement for the trial court to determine the Warrell murder was sufficiently similar to Trimble's murder that evidence of the Warrell murder was admissible to prove identity in the Trimble case.

We next address appellant's contention that even if the evidence was relevant and admissible under rule 404(b), the trial court abused its discretion by failing to exclude it under rule 403. Rule 403 allows for the exclusion of otherwise relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. The rule favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Martinez v. State,* 327 S.W.3d 727, 737 (Tex. Crim. App. 2010); *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009). Rule 403 does not require exclusion of evidence simply because it creates prejudice; rather, the prejudice must be "unfair." *Martinez*, 327 S.W.3d at 737. To determine admissibility under rule 403, courts consider (1) how compellingly evidence of the extraneous misconduct serves to make more or less probable a fact of consequence; (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way; (3) the trial time needed to develop evidence of the extraneous misconduct; and (4) the proponent's need for the extraneous offense evidence. *Lane*, 933 S.W.2d at 520. We uphold the ruling on a rule 403 balancing test if it is within the zone of reasonable disagreement. *Id*.

The first factor in the rule 403 balancing analysis considers the strength of the extraneous offense to make a fact of consequence more or less probable. At trial, appellant disputed his identity as the murderer, which is a fact of consequence in the case. The Warrell murder, given its striking similarities with the Trimble murder, including the presence of appellant's DNA on both

women's bodies, is compelling evidence of identity and probative of appellant's identity as the person who murdered Trimble. That Trimble was murdered twelve years before Warrell is a factor to consider when assessing the probative value of the evidence, but it does not alone render it excludable. *See Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd) (concluding extraneous offenses committed more than twenty years before charged crime admissible under rule 403). Even considering remoteness, we conclude the probative value of the evidence was strong.

The second factor requires us to examine the extraneous offense evidence "for its potential to impress the jury in some irrational but indelible way," such as character conformity. But an impermissible inference of character conformity can be minimized by the use of a limiting instruction. *McGregor v. State*, 394 S.W.3d 90, 120–21 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd ). Here, before admitting evidence of Warrell's murder, the trial court specifically instructed the jury it could consider the evidence only for the limited purpose of identity; the court told jurors it could not consider the evidence as a substitute for proof that appellant committed the crime charged or as proof that appellant had a "criminal personality or bad character." The trial court repeated the instruction a second time the following day before the Kaufman County investigating officer testified. Additionally, the trial court included the same limiting instruction in the jury's charge. Nothing in the record indicates the jury could not, or did not, evaluate the import of this evidence in accordance with the trial court's oral and written instructions. Nor do we perceive any reason a limiting instruction would be any less effective in the present case than in other cases in which identity is an issue. *See Lane*, 933 S.W.2d at 520. Additionally, the evidence regarding Warrell's murder was no more heinous than Trimble's murder and was not likely to create such prejudice that the jury would have been unable to limit its consideration to its proper purpose. *See Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996).

The third factor takes into account the amount of time taken to develop the evidence of Warrell's murder. The evidentiary portion of the guilt-innocence phase of the trial lasted about two-and-a-half days. The defense presented no witnesses and rested after the State presented its case. The extraneous offense evidence took less than a half day to present and constituted no more than about 70 pages of more than 500 pages of testimony, or about fifteen percent. *See Lane*, 933 S.W.2d at 520 (concluding amount of time not excessive when developed in less than one-fifth of testimony in State's case in chief). Appellant argues the State took an "inordinate" amount of time and essentially tried him for Warrell's murder by calling the investigating officer, two DNA witnesses, and the medical examiner who performed the autopsy on Warrell's body in 2001. But the State had to do more than simply offer evidence of the prior murder conviction; these witnesses were necessary to develop the details of the Warrell offense to show the similarities to the instant offense, including evidence that appellant's DNA was found on her body and that she died by ligature strangulation. *See Segundo*, 270 S.W. 3d at 90 (noting that developing chain of custody for vaginal swabs, analysis for semen, and identification of DNA profile then matched against the appellant's, "requires a long list of witnesses and a slow plod through pertinent scientific procedures"). As for the admission of photographs of the Warrell crime scene, these photographs illustrated the similarities between the two crimes: both bodies, nude or partially nude, and covered by either a sheet or clothing, were dumped on the side the road in undeveloped areas. This was not evidence that might lead the jury into an irrational or emotional decision; it was admissible as evidence of identity in Trimble's murder and to ensure the jury considered the extraneous offense for its proper, limited purpose.

Finally, the State's need for the evidence was great. More than twenty-seven years had passed by the time appellant was tried for the murder of Trimble. Much of the evidence was circumstantial, and identity was contested. There were no witnesses to the murder or to the

dumping of the body. The only physical evidence connecting appellant to Trimble's murder was his DNA found inside her vaginal and anal canals. But appellant ultimately admitted to investigators that he was having a sexual relationship with Trimble, which would provide an explanation for the evidence.

Here, considering all of the factors, we conclude the trial court was within the zone of reasonable disagreement when it concluded the probative value of the extraneous offense was not substantially outweighed by the danger of unfair prejudice, confusion of issues, and misleading of the jury; thus, the trial court did not abuse its discretion in overruling appellant's rule 403 objection. We overrule the sole issue.

We affirm the trial court's judgment.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
170506F.U05

–11–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

TEMMIE COOLEY, Appellant

No. 05-17-00506-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial District Court, Collin County, Texas
Trial Court Cause No. 416-82809-2014.
Opinion delivered by Justice Francis; Justices Bridges and Lang-Miers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered December 6, 2018.